**BARTOW, TRUSTEESHIP OF, In Re**

Ohio Common Pleas, Lake Co

Decided Dec 10, 1938

230

William M. Hubbard, Painesville, and Charles Higley, Cleveland, for the exceptors.

S. H. Squire, Superintendent of Banks, Columbus, Charles R. Berne, Cleveland, Paulin & Frazier, Painesville, and S. S. Kates, Cleveland, for the defendant.

E. F. Blakely, Painesville, and A. G. Newcomb, Cleveland, for amicus curiae.

## OPINION

By SLOCUM, J.

Counsel in this case have been very helpful to the court in presenting excellent briefs, which merited the name of brief in that they were as short and concise and well indexed as possible, considering the many matters which had to be covered, including the vast amount of exhibits. The court feels that it would not be possible to cover the many transactions and the law involved fully without rendering an exceedingly lengthy opinion. This court will therefore attempt in as few words as possible to summarize the claims of the parties, the issues involved, and the evidence.

The history of the case as disclosed by the eivdence and stipulations of fact is as follows:

Pauline L. Bartow died in 1913. Her will, after providing for a cash bequest, devised one-third of the remainder to her daughter, Helen B. Hubbard. Remaining two thirds, comprising a large estate, was devised to The Guardian Trust Company in trust, the powers of the trustee being thus expressed in the will:

"Said trustee shall have the right to invest and reinvest said trust estate in any manner it deems advisable as authorized by the statutes of Ohio."

By the terms of the will, the bank was to pay the income of one-half of the estate to Grace B. Bates, daughter of the testatrix, during her life, and after her death, to distribute the principal to John B. Bates and Pauline H. Bates, the children of Grace B. Bates in equal shares or to the survivor of them. The income of the remaining one-half of the estate was to be paid to Francis B. Bowman, a grandson of the testatrix, until he had reached the age of twenty-six years, at which time said one-half was to be distributed to him, and this was done in July, 1925, distribution in kind of one-half of the estate being then made to him. The complaints of the exceptors relate only to the portion of the estate left to Grace B. Bates and her children.

Numerous investments in all types of securities were made by the Guardian Trust Company as trustee, including investments in land trust certificates and leasehold bonds. Such investments were among those distributed in kind by order of court to Francis B. Bowman and accepted by him.

The bank, as trustee, from time to time during the administration of the trust, filed six partial accounts, each of which was approved by the Probate Court.

On June 15, 1933, the superintendent of banks of the State of Ohio took charge of the affairs of the Guardian Trust Company for liquidation as a result of its insolvency and posted the proper statutory notices, advertised for filing of claims and complied with the statutory requirements applicable to the taking over of a bank for liquidation.

On August 14, 1933, upon application by the beneficiaries, Grace B. Bates, John B. Bates and Pauline H. Bates, The Guardian Trust Company was removed as trustee and was ordered to file its final account, and thereafter pursuant to said order the superintendent of banks on September 19, 1933 filed a final account, which was approved by the Probate Court on December 12, 1933.

On April 9, 1934 the beneficiaries filed exceptions to the final account and sought to re-open six partial accounts previously filed and approved, claiming that fifteen of the numerous investments made by the trustee had been wrongfully made.

The investments complained of by the exceptors are as follows:

LAND TRUST CERTIFICATES

| DATE | NAME | PRICE PAID |
|---|---|---|
| Feb. 11, 1925, | Gasser Building Site | $4000.00 |
| Oct. 7, 1925, | H. F. Neighbors Realty Co. | 4968.75 |
| Oct. 3, 1925, | 9400 Euclid Ave., also known as Pasadena Invest. Co. | 2500.00 |
| Dec. 17, 1926, | Pasadena Invest. Co. | 500.00 |
| Dec. 9, 1930, | Pasadena Invest. Co. | 1000.00 |
| Feb. 21, 1924, | Chester-East 18th St. | 5000.00 |
| Oct. 19, 1923, | 6545 Carnegie Avenue | 1000.00 |
| Oct. 19, 1923, | Chester-East 19th Realty Co. | 2500.00 |
| Jan. 29, 1923, | Reserve Square Realty Co. | 500.00 |

March 2, 1923, Chester Avenue South
Side Near Dodge Court          1500.00
Mar. 9, 1918, Ontario-Huron South-
east Corner          5000.00
May 9, 1927, Michigan Office and
Theatre Building          4987.50
June 3. 1927, Michigan Office and
Theatre Building          997.50

The Guardian Trust Company as trustee also invested in first mortgage leasehold bonds as follows:

Sept. 16. 1923, 6545 Carnegie Ave. $1000.00
July 9, 1923, J. A. Wigmore Co.          960.00

Some of the foregoing investments were originally for a larger amount, the amounts, given above being the amounts remaining in the trust estate at the time The Guardian Trust Company, closed, with the exception that of the Ontario-Huron Company land trust certificates $3000.00 was distributed to a beneficiary other than the excepting beneficiaries, leaving $2000.00 of the Ontario-Huron Company in the trust at the time the bank closed.

These exceptions are on the following grounds:

1. That in each and every one of the above transfers evidenced by cash credits claimed in the various accounts, the Guardian Trust Company was adversely interested as a vendor, participating in the profits arising from the transfer of said securities to the account of the trust estate.

2. That The Guardian Trust Company was otherwise interested in and influenced in making said purchases by compensations and advantages inuring to the said trustees personally.

3. That the investments in said securities were not authorized by the statutes of the State of Ohio.

The nature of land trust certificates may be described as follows: They represented participation in the ownership of real estate under lease for a long term at a fixed rental, the title being held in the name of a trustee under a declaration of trust for the benefit of all of the certificate holders. An issue of such certificates would be set up in the following manner:

An owner of property would execute a deed to the trustee and simultaneously therewith the trustee would execute to the owner a long term lease. Concurrently with these transactions there would be recorded a declaration of trust wherein the trustee declared that it was holding title to the property in the trust, subject to the long term lease, for the benefit of such persons who might become holders of land trust certificates issued under said declaration of trust.

All documents were escrowed and the transaction was completed only on condition that title to the property was clear except the long term lease in question which provided the fixed income from rentals to be apportioned to the land trust certificate holders.

As was customary in the case of all long term leaseholds provision was made in the lease for the deposit by the lessee of regular installments of rental in advance, one or more of such installments being deposited upon the completion of the escrow and prior to the issuing of the land trust certificates. This insured a close check upon the lessee's performance and was an important factor in safeguarding the return to the certificate holders not only from the outset but during the continuance of the lease.

After the title to the property was cleared, so that the same was free of all encumbrances except the long term leasehold, and the escrow was completed, the land trust certificates, representing equitable interests in the ownership of the fee, would be issued.

The course of dealing of this bank as trustee can be summarized by showing its acts in one of these land trust issues as an example, namely, the lower Chestnut, also known as Chester Near Dodge Court.

In creating these land trust certificates The Guardian Trust Company acted as escrow agent and was trustee for the land trust certificates. It received out of the escrow funds an acceptance fee of $4,000.00 and an annual fee of $200.00. It received payment of ground rent for one year in advance amounting to $7695.00. It purchased the entire issue amounting to $135,000.00 through its bond department, thereafter selling the certificates chiefly to itself as trustee for individual trusts, although there were several sales to individuals. This to the court evidences the absolute ownership and control of the certificates by the Guardian Trust Company.

During the time these certificates were held by it, it received and retained as general earnings of the bank accrued income and the Bartow trust was charged with accrued income on the portion sold to it. The voucher filed with the fourth account supporting the purchase of these land trust certificates as well as the entry in the account, shows that these were purchased by The Guardian Trust Company as trustee of the Bartow estate from the Guardian

Trust Company and that The Guardian Trust Company received payment therefor. It was to receive annual fees in the sum of $200.00 as trustee under its declaration of trust and was paid an acceptance fee of $4000.00.

It would thus seem that counsel for the superintendent of banks would have the court believe that it is proper for a banking and trust company to construct large land trust issues for future sale of certificates of equitable interest therein in indefinite amounts to indefinite trust estates under its dominion. In connection therewith, the corporate trustee would have the right and did in this case exercise it in determining the price at which the certificates should be sold to the trusts, to fix and collect its own charges for its services rendered in the construction, and to make itself trustee of the land trust issues. · In this connection it would be perfectly proper, under the contention of counsel for the superintendent of banks, for the trustee in the exercise of trust powers under the varying trust instruments, to change the investment portfolios of trust estates by selling securities on hand and substituting what may be well termed the bank's own home made land trust certificates.

Experience has shown that trusts serve highly important purposes in our life and the law is plain that in furtherance of these purposes, trustees must administer their trusts for the sole benefit of the beneficiaries and that they can not buy from or sell to themselves. The court believes that The Guardian Bank acting as a trustee has attempted to follow too literally the Bible maxim of "Let not thy left hand know what thy right hand doeth", and that it was the owner and vendor of the property sold to the Bartow estate. It is hard for the court to believe the reasoning of counsel for the superintendent of banks: That the so-called L. T. 1043 was a mere "allocation account or a reservoir created by the trustee of the trusts at the Guardian Bank for the express purpose of serving and servicing these trusts" and that it "was not the bank", but "an agency for the Bartow trust and all the other trusts of which the bank was fiduciary." On the contrary, the court feels that on the evidence this account could hardly rise to the dignity of "a reservoir" or an ocean on which the securities navigated on the high seas outside of the three mile limit and hence not subject to the Guardian Bank's jurisdiction and control, but that it was the bank's own fish pond on its private premises which it stocked heavily with its securities and dip-

ped out and served to its trust estates, as to the Bartow estate, when it pleased, primarily for its own corporate benefit.

This court is of the opinion that the claim of the superintendent of banks, first, that the Probate Court has no jurisdiction to settle accounts against a trustee whose assets are in the hands of the superintendent of banks for liquidation, and second, that if such right does exist, then it is without jurisdiction to make any finding or render any judgment resulting in the establishment of a claim against the assets of the Guardian Bank in the hands of the superintendent, has no merit, and that such court has such jurisdiction.

The court also believes that on the evidence the superintendent's claim that the exceptors are barred of a remedy because of their acquiescence, confirmation and ratification of the acts of the trustee and because of their laches, is not sustained.

The court feels that on the authority of **In Re Penelope v Osborn, 10 O.O. page 444,** the investments in said securities were not authorized under the statutes of Ohio.

It is therefore the opinion of the court that the exceptors' exceptions should be sustained on the three grounds claimed by them which are heretofore set forth in this opinion and that they are entitled to have all these investments set aside and a new final account directed charging the Guardian Trust Company with the amounts so unlawfully appropriated with interest, crediting thereon all sums paid to the life beneficiary by way of interest and rents upon the repudiated investments. Incident thereto the court believes that the exceptors are entitled to a lien upon each of these investments in the hands of the successor trustee for the amount due by reason of such unlawful investment.

Prevailing counsel will therefore prepare a journal entry in accordance with this opinion and submit the same to opposing counsel and the court for approval. Noting proper exceptions.